# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

|  |  |
|---|---|
| EDDIE L. HATCH, JR. and MICHELLE DAVIS-HATCH, | |
| Plaintiffs, | Case No. 20-CV-1791-JPS |
| v. | |
| TOM BARRETT, JEFF HANEWALL, ANGELIQUE L. SHARPE, STEPHANIE HARLING, ASHANTI HAMILTON, JAMES STARKE, SAKURI FEARS, ANDREA PRATT, CINNAIRE SOLUTIONS, CHRISTOPHER LAURENT, JAMES DOW, WILLIE SMITH, HOWARD SNYDER, DWAYNE K. EDWARDS, MATT HAESSLY, AMY E. TURIM, KEN LITTLE, MARTHA BROWN, VANESSA KOSTER, NWSCDC a/k/a NORTH WEST SIDE COMMUNITY DEVELOPMENT CORPORATION, and HAVENWOODS HEDC/BID #31, | **ORDER** |
| Defendants. | |

## 1. INTRODUCTION

On December 4, 2020, Plaintiffs Eddie L. Hatch, Jr. ("Eddie") and Michelle Davis-Hatch ("Michelle") (collectively, "Plaintiffs") sued over two dozen defendants for allegedly interfering with Plaintiffs' plan and efforts

to purchase a property owned by the City of Milwaukee (the "City" or "Milwaukee"). ECF No. 1 at 5.[1]

Now before the Court are five sets of Defendants' motions for summary judgment. ECF Nos. 153 (brought by Defendants Stephanie Harling ("Harling"), Havenwoods HEDC/BID #31 ("Havenwoods"), and Angelique L. Sharpe ("Sharpe") (collectively, the "Havenwoods Defendants")); 156 (brought by Defendants NWSCDC a/k/a North West Side Community Development Corporation ("NWSCDC"), Willie Smith ("Smith"), and Howard Snyder ("Snyder") (collectively, the "NWSCDC Defendants")), 162 (brought by Defendants Tom Barrett ("Barrett"), Dwayne K. Edwards ("Edwards"), Sakuri Fears ("Fears"), Matt Haessly ("Haessly"), Ashanti Hamilton ("Hamilton"), Vanessa Koster ("Koster"), Ken Little ("Little"), Andrea Pratt ("Pratt"), James Starke ("Starke")[2], and Amy E. Turim ("Turim") (collectively, the "City of Milwaukee Defendants")); 175 (brought by Cinnaire Solutions ("Cinnaire"), James Dow ("Dow"), and Christopher Laurent ("Laurent") (collectively, the "Cinnaire Defendants") and 181 (brought by Jeff Hanewall ("Hanewall")) (collectively, the "Moving Defendants"). For the reasons discussed herein, the Court will grant the motions and dismiss the case with prejudice.

---

[1] The operative complaint is Plaintiffs' second amended complaint, filed June 17, 2022. ECF No. 80. In January 2023, the Court clarified that "the claims moving forward [to the summary judgment stage] are . . . Plaintiffs' defamation claim against Defendant Jeff Hanewall; Plaintiffs' claims under 42 U.S.C. § 1981 . . . . ; Plaintiffs' claims under 42 U.S.C. § 1982 . . . . ; and Plaintiffs' claims for civil conspiracy under 42 U.S.C. § 1983 . . . ." ECF No. 115 at 3 (dismissing with prejudice all other asserted claims on which Plaintiffs were given leave to amend due to "Plaintiffs' failure to submit an actual third amended complaint").

[2] Starke's name was spelled incorrectly as "Starks" on the docket and is corrected to Starke in this Order and will be updated on the docket.

## 2.    NON-SERVED, NON-APPEARING DEFENDANT

Before turning to the merits of the pending motions for summary judgment, the Court addresses a loose thread. In March 2021, a summons was returned unexecuted as to Defendant Martha Brown ("Brown"). ECF No. 25. Since that time, Plaintiffs do not appear to have effectuated service on Brown. *See* Fed. R. Civ. P. 4(m) (requiring service on a defendant "within 90 days after the complaint is filed"). Neither Brown, nor any attorney on her behalf, has ever appeared in this action.[3] Plaintiffs have never requested entry of default as to Brown, nor have they acknowledged her failure to appear in the action. Plaintiffs have, in other words, failed to appropriately and timely prosecute their claims against Brown.

"[I]t is . . . well established that pro se litigants are not excused from compliance with procedural rules." *Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (citing *McNeil v. United States*, 508 U.S. 106, 113 (1993)). That maxim extends to procedural rules governing service of process and the process of seeking entry of default and default judgment against non-appearing defendants. Plaintiffs utterly failed to comply with those requirements with respect to Brown, and so the Court will dismiss Brown as a defendant from the action.

---

[3]In September 2022, Attorney Tyler Helsel appeared on behalf of Barrett, the City, the Department of City Development, Edwards, Fears, Haessly, Hamilton, Koster, Little, Pratt, and Turim, but not as to Brown, ECF No. 101, notwithstanding that Brown, during the relevant period, allegedly worked for the Department of City Development as Deputy Commissioner. *See* ECF No. 80 at 2.

### 3. FACTUAL BACKGROUND[4]

#### 3.1 General Overview

This case arises out of a dispute surrounding the potential sale of a commercial property—an old library—located on the Northwest Side of Milwaukee on West Villard Avenue (the "Property"). The Property was, during the relevant period, and remains, vacant and owned by the City. The City began accepting proposals for the purchase and sale of the Property in 2018, but the City did not ultimately accept any of the proposals and never sold the Property.

#### 3.2 The Parties

##### 3.2.1 Plaintiffs

Plaintiffs are a married couple. During the relevant period, they owned and operated Night Owl Services, LLC ("Night Owl") out of their residence. Night Owl was minority- and woman-owned and was in the business of appliance and HVAC repair.[5]

---

[4]The following recitation of facts is drawn from the parties' agreed upon statement of facts, ECF No. 144, with minor, non-substantive edits. Internal citations are omitted for brevity. The Court also notes, where applicable, any asserted disputes of fact. *See* ECF Nos. 147 (NWSCDC Defendants' statement of disputed facts), 159 (Havenwoods Defendants' statement of disputed facts), and 179 (Cinnaire Defendants' statement of disputed facts). The City of Milwaukee Defendants also filed a two-page document entitled "Defendants' Proposed Findings of Fact," most of which are pulled from deposition testimony. ECF No. 164. It is not clear whether these asserted facts are disputed and, if not, why they are not included in the overall agreed upon statement of facts, ECF No. 144.

The Court is also forced to insert facts from other portions of the record where the parties' agreed upon statement of facts fails to fully describe relevant events or is otherwise deficient. *See infra* note 8. Where the Court does so, a citation to the relevant portion of the record will follow, setting such information apart from that which is drawn from the agreed upon statement of facts.

[5]The precise scope of Night Owl's operations is not entirely clear. In his deposition, Eddie described it as being "in the commercial food service industry"

In 2014, Plaintiffs began searching for commercial real estate to expand Night Owl. They were ultimately unsuccessful. Night Owl is now closed as of April 2022.

### 3.2.2 The NWSCDC Defendants

NWSCDC is a 501(c)(3) non-profit that aims to transform the Northwest Side of Milwaukee. Snyder was NWSCDC's Executive Director during the relevant period. He is no longer employed by NWSCDC in any capacity. Snyder was not on the review committee for the potential sale of the Property. Neither Eddie nor Michelle has ever met or spoken with Snyder, and Michelle testified that her familiarity with Snyder was limited to having "seen him in emails."[6]

---

and recently in operation of "[v]ending machines." ECF No. 176 at 3. It appears that Night Owl originally focused on "HVAC work" but that the "HVAC portion" of the business "has . . . closed." *Id.* at 3, 9, 29.

[6]Speaking of emails, Plaintiffs in their depositions referred to them repeatedly and broadly. Plaintiffs largely failed, however, both in their depositions and in their response to the motions for summary judgment, to cite to any specific email(s) or portion(s) thereof, instead relying on them as a whole, generally. ECF No. 176 at 39 ("Yes, sir, it's in the emails that I failed to bring, but it is in Document 78."), at 38 ("[Y]ou brought none of [the emails supporting the claims] here today?" A: "I brought none of them because they're too incomplete to give to you to state my claim."), at 45 (A: "It's not the whole story." Q: "Those stories are in the emails and documents that you didn't bring today?" A: "That's correct."), and at 70 ("I would have to go through all of the emails that [Haessly's] a part of and that he's cc'd in on and that he's communicating in to say this is what [Haessly] did . . . . When I provide that for you, you pick and choose yourself . . . ."); ECF No. 178 at 5 ("I know most of our evidence is emails, but when you go through those emails and those conversations, there's clear evidence in there that's showing how they were working together . . . ."), at 28 (Michelle telling examining attorney that she "do[esn't] remember verbatim the emails" and "that's why you need to check it"), at 29 ("In these emails, I'm understanding they've already concocted a plan to do what they wanted to do."), at 43 (Q: "And where does that personal knowledge come from?" A: "In the emails when we read it."), and at 46 (Q: "What role did [] Turim play in the scheme?" A: "I'll refer you to the emails.").

Smith was a board member of Business Improvement District ("BID") #19 and currently serves as NWSCDC's Executive Director. Michelle testified that she and Eddie met with Smith to "discuss . . . [their] plan to purchase the [P]roperty."

When asked "[w]hat evidence do you have that [NWSCDC], [] Smith, or [] Snyder had any influence over" the proposal and purchase process of the Property, Michelle testified, "[n]one that I recall." When asked "[w]hat evidence do you have that [the NWSCDC Defendants] had any authority or control" over the process, Eddie testified, "[n]ot control, but input via the emails." When asked "[w]hat evidence do you have th[at] [] Snyder was influencing [Barrett] and the City related to [the Property]," Eddie responded, "[w]ell, as he was meeting and working with them, I don't think he was volunteering just to be there. He was a part of the discussions to get this deal done." Eddie also testified that he believed that the NWSCDC Defendants worked together and used their associations to "help this whole project get through." And when asked "[w]hat evidence do you have that the City was required or had to listen to [NWSCDC], [] Smith, or [] Snyder," Michelle responded, "[w]ell, none."

---

"[W]here a non-moving party denies a factual allegation by the party moving for summary judgment, that denial must include a specific reference to the affidavit or other part of the record that supports such a denial. Citations to an entire transcript . . . or to a lengthy exhibit are no specific and are, accordingly, inappropriate." *Ammons v. Aramark Unif. Servs.*, 368 F.3d 809, 817–18 (7th Cir. 2004). This is precisely what Plaintiffs have done. They have essentially sat back and directed both the Moving Defendants and this Court to pick out for themselves portions of the hundreds of pages worth of email exhibits in the record. "A court should not be expected to review a lengthy record for facts that a party could have easily identified with greater particularity." *Id.* at 818 (citing *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 921–22 (7th Cir. 1994)).

When asked "[w]hat evidence do you have that [] Snyder's action was racially motivated," Eddie responded, "[b]ecause he's trying to help a white man with no money get a building that a black family is prequalified to buy, wanting, and stopped us from getting." When asked the same question regarding Smith, Eddie responded: "to support a white man with no funding, to go along with that white man to purchase this [P]roperty with the powers that be, . . . they were supporting that. Even if they never supported us, they all joined in to make this deal happen." When asked "[i]s there anywhere in the emails where [the NWSCDC Defendants] demonstrate that the decision was racially motivated," Michelle responded, "[o]ther than working with the other team of people [the Cinnaire Defendants], nowhere." When asked, "[d]id anyone from [NWSCDC] ever tell you that they did not want you to buy this property" or "that they didn't want a black man buying the property," Eddie answered in the negative. And when asked whether he ever "ask[ed] [] Smith why [Plaintiffs] didn't get the bid for [the Property]" or whether he "ever ask[ed] anybody [else] from [NWSCDC] . . . about why you didn't get the [P]roperty," Eddie responded in the negative.

### 3.2.3   The Cinnaire Defendants

Cinnaire is a Michigan non-stock, non-profit corporation. It is a community development financial organization that makes investments and loans to developers and nonprofit organizations. Cinnaire has decades of experience in accessing Low-Income Housing Tax Credits, New Markets Tax Credits, and other finance sources, to support development in economically and racially marginalized communities. Its investments have resulted in more than $10.1 billion in community impact.

Laurent has been the President of Cinnaire since 2018. Dow was a Development Associate, and then a Development Manager, for Cinnaire from approximately May 2018 to October 2020. In her deposition, Michelle testified that she did not "know who . . . Dow is." ECF No. 178 at 31.

At his deposition, Eddie was asked: "So are there any documents or communications that indicate that Cinnaire was chosen because they were white over you being black?" Eddie responded, [n]o, that's not the claim."

### 3.2.4   Hanewall

Hanewall is a Principle at Engberg Anderson Architects and was appointed to the BID #19 Board in May 2019. BID #19 contracted with Havenwoods to provide services in the community, and the Property is within BID #19. Hanewall served as President of the BID #19 Board from January 2019 to December 2021. At no point did Hanewall own the Property or have the authority to sell it, and at no point did he recommend that Cinnaire's proposal be selected.

Eddie testified to having had "several" personal conversations "one on one" with Hanewall, but he conceded that Hanewall never made "racial or racially tinged" remarks to him. When asked "[i]s there a document that exists where [Hanewall] makes a clear racial statement or anything close to being a racial implication . . . that ultimately led to your . . . not acquiring the [Property]," Eddie answered "[n]o, he don't have to confess." Eddie was also asked: "To your knowledge, did . . . Hanewall ever make any false statements about you or Night Owl . . .?" Eddie responded, "I think he did, but I can't say for sure."

Michelle confirmed that Hanewall "wasn't involved in making the actual decision on who should be the winning proposal, if anyone." She was asked: "So regardless of what the review committee or . . . Hanewall

would have said, it wouldn't have mattered because . . . Hamilton had already made up his mind before the process started; correct?" Michelle responded: "Yes . . . [A]fter receiving the open records request, we then learned that we were just being carried along for a ride. They never intended to sell that property to anyone in our community. Their minds were made up." She was then asked: "So if their minds were made up that this property was going to Cinnaire, it wouldn't have mattered whether you were white, black, Latino, the project wasn't going to go to you, it had already been a foregone conclusion it was going to Cinnaire; correct?" Michelle responded: "If that's how you see it, yes."

Michelle also testified that she did not recall Hanewall ever "making any statements" to her with "racial connotations or racial implications." She also confirmed that Hanewall never "indicate[d] to [her] that the reason [Plaintiffs'] proposal wasn't selected was because of [their] race."

When asked, "[d]o you have any evidence . . . that . . . Hanewall tried to advocate against you over Cinnaire," Michelle responded: "Emails of derogative statements saying that we were not prepared." She testified that it was "false for him to say that we were not prepared." She did not specify in which email or emails these "derogative statements" appear. In any event, Michelle confirmed that such "derogative statements" were Hanewall's "opinion based on his review" of Plaintiffs' proposal.

### 3.2.5   The Havenwoods Defendants

Harling founded Havenwoods, a Wisconsin non-stock corporation. During the relevant period, she served as its executive director.

Havenwoods has historically worked closely with BID # 31, but its relationship with BID #19 is newer, arising in April 2018. Under the

operating plans of BID #19 and BID #31 for 2018 through 2020, both BIDs contracted with Havenwoods for services.

Sharpe, from 2018 to 2020, was an employee of Havenwoods and was in the process of taking over management of BID #19.

Havenwoods began implementing an action plan in the community in 2018. It organized a street clean up, met with owners of vacant buildings, formed a crime watch committee, and began working with the City to install security cameras and security lighting in BID #19, among other measures. Similarly, BID #31's objectives include attracting more businesses to the neighborhood, engaging in community organizing, and increasing safety.

Havenwoods also held visioning sessions with BID #19 to obtain feedback from residents and businesses. The visioning sessions asked participants how they would like to see BID #19 improve and expand. Havenwoods also held focus groups specifically to obtain community feedback regarding several properties, including the Property. Plaintiffs attended and participated in the vision sessions and focus groups. Plaintiffs believe, however, that these groups and sessions were essentially facades, used to interfere with the progression and acceptance of their proposal.

During the relevant period, Harling and Sharpe met with Plaintiffs and discussed their proposal for purchase of the Property. During this meeting, Plaintiffs shared their "business plan," to which Harling "said that [Plaintiffs] were trying to do too much." ECF No. 176 at 8. Eddie testified that he believed that the Havenwoods Defendants "had influence over" the decision about which proposal would be selected because "if [the Havenwoods Defendants] said no, like [Harling] ultimately did say we're trying to do too much, that would go right back to the other people that she

would report to, whoever that was." *Id.* at 13. Eddie also testified that he "d[idn't] know" whether Harling "had any racial component" to her attitude regarding Plaintiffs' proposal and that he was "not . . . aware of" any "racial component" on Sharpe's part. *Id.* at 14. Eddie also testified that Harling tried to "steer [Plaintiffs]" away from the Property and towards other, less desirable properties at Edwards' direction. *Id.* at 25.

Michelle testified that, apart from Harling saying that Plaintiffs "were trying to do too much and [weren't] prepared," she "c[ould] not think of" any other evidence to indicate that the Havenwoods Defendants were opposed to Plaintiffs' proposal. ECF No. 178 at 36. She also testified that she "h[ad] [no] evidence to show that" Harling's attempt to steer Plaintiffs towards other properties "wasn't made in good faith." *Id.* at 46. When asked "[w]hat other evidence do you have that [the Havenwoods Defendants] worked behind the scenes to prevent you from getting the [P]roperty . . . besides the emails," Michelle said, "I don't actually have that evidence. That's why we're requesting open records from your clients . . . ." *Id.* at 37;[7] *see also id.* (Q: "Do you have any other evidence to support my client's involvement in this discrimination action?" A: "Other than the email communications, no.").

---

[7]Plaintiffs also assert at the conclusion of their response in opposition that "[n]o one's cell phone data was disclosed." ECF No. 190 at 19. If Plaintiffs believed that any Defendant was withholding discovery materials to which Plaintiffs were entitled, they ought to have timely and promptly brought such issue to the Court's attention, rather than waiting to allude to such an issue in the conclusion of their summary judgment response over two and a half years after the case's inception.

### 3.2.6 The City of Milwaukee Defendants[8]

Barrett served as the Mayor of Milwaukee. Eddie testified that his biggest issue with Barrett was that Eddie "reached out to . . . Barrett personally and he did nothing to intervene in this when he had a fiduciary responsibility" "[t]o the citizens in the state and the taxpayers in their community" "to do so." ECF No. 176 at 68; *see also* ECF No. 178 at 43 (Q: "What role did . . . Barrett play in this scheme?" A: "Negligence to respond to our requests for him to look into the matter."). When asked, "[d]o you have any evidence that . . . Barrett is involved" in Plaintiffs' allegations, Eddie responded, "[o]ther than the fact that he was put on notice and he did nothing, no." ECF No. 176 at 69.

In his deposition, Eddie described Koster as a "subordinate[]" who was "following orders" by "[c]reating . . . documents and such in support of [the Cinnaire Defendants]." ECF No. 176 at 69. When asked, "[s]o it's your position that simply by her acquiescing, staying on board, she intentionally discriminated against you," Eddie responded, "[y]es, yes, she did." *Id.* Michelle testified that she never met Koster and was unable to provide any testimony regarding her. ECF No. 178 at 53.

In his deposition, Eddie described Haessly as "a big key player." ECF No. 176 at 70. Eddie testified that Haessly "creat[ed] the asbestos scheme [and] the review committee scheme . . . ." *Id.* When asked whether he had

---

[8]The parties' agreed upon statement of facts entirely fails to identify each of the individual City of Milwaukee Defendants' roles—who they are, what they did in their respective jobs for the City during the relevant period, and what involvement, if any, they had individually in the solicitation and review of proposals for the Property. Accordingly, the Court attempts to fill in the gaps with other portions of the record where possible—the precise course of action that this Court's summary judgment protocols aim to render unnecessary.

Case 2:20-cv-01791-JPS   Filed 10/23/23   Page 12 of 37   Document 203

"any evidence other than the emails reporting what . . . Haessly did," Eddie responded that he was "[n]ot sure." *Id.* at 71.

Hamilton was an Alderman for the City and President of the Milwaukee Common Council. *See* ECF No. 192-1 at 9. According to Eddie, Hamilton discriminated against Plaintiffs by supporting the Cinnaire Defendants over Plaintiffs. ECF No. 176 at 73. Michelle testified that Hamilton "lied to [Plaintiffs]" by telling Plaintiffs that he "supported [Plaintiffs] in the acquisition of the [P]roperty," but then "continu[ed] to go along with" the Cinnaire Defendants. ECF No. 178 at 43.

Pratt served as legislative assistant to Hamilton. ECF No. 176 at 5, 71; ECF No. 78-2 at 156. When asked what role Pratt played in Plaintiffs' allegations, Eddie responded that she helped "put together th[e] March 18" meeting and "did her part" to further the general "scheme[s]." ECF No. 176 at 71.

Eddie characterized Starke as "Hamilton's assistant" and testified that Starke "facilitated these different schemes to come up with these reasons to interfere with what we were doing." *Id.* at 75. "He worked . . . to make sure that [the Cinnaire Defendants] got what they needed to get through this process." *Id.* at 76. When asked what role Starke played in the alleged schemes to discriminate against Plaintiffs, Michelle testified that she "c[ouldn't] say" "whether [Starke] played any role in th[e] alleged scheme." ECF No. 178 at 44.

Fears was Chief of Staff for Hamilton during the relevant period. ECF No. 176 at 77; ECF No. 192-1 at 9. Eddie testified that he believed that Fears "came up with the idea . . . of one of the visioning sessions . . . ," which Eddie believes was one of many schemes to prevent Plaintiffs' acquisition of the Property. ECF No. 176 at 77. Michelle testified that Fears would

"tak[e] messages for [Hamilton]" from Plaintiffs and Hamilton would "not receiv[e] them." ECF No. 178 at 44. When asked what Fears "could have done better to prevent [the parties] from being in this situation today," Michelle responded: "[J]ust have better communication with [Hamilton], things like that." *Id.* at 52.

With respect to Turim, Eddie testified that she "provided the boilerplate document for the review committee" and supervised Edwards, Haessly, and Koster. ECF No. 176 at 77. Michelle testified that she never met Turim and was unable to provide any testimony regarding her. ECF No. 178 at 53.

When asked what role Little played, Eddie testified that Little "facilitated that first excuse as to the reason why we shouldn't . . . acquire that property" and that Little "d[idn't] think our funds were good enough or something." ECF No. 176 at 78.

Finally, Eddie described Edwards in his deposition as "the primary culprit" who falsely assured Plaintiffs that the building was theirs. *Id.* at 79. Eddie testified that Edwards "contacted [Harling] and asked her to steer [Plaintiffs] away from the [P]roperty." *Id.* at 7, 78. He also claims that Edwards "came up with the asbestos scheme" and "came up with the review." *Id.* at 79.

### 3.3    The Potential Sale of the Property

In September 2018, the City issued a Request for Proposals for the Property. The City listed the Property at $50,000. ECF No. 78-2 at 9.

The following month, Plaintiffs submitted a bona fide, funded proposal with no contingencies for purchase of the Property. They offered $40,000 and were pre-approved by their lender. On the portion of the proposal form that called for a "detailed project/use description," Plaintiffs

wrote: "Contractor's repair and training facility. Commercial appliances and parts warehouse and show room with a certified commercial kitchen." Their total project budget was $155,050. ECF No. 78-2 at 4. Eddie testified that their plans for the Property included "commercial appliance repair facility," "training facility," "banquet[]" event space, and "networking" space. ECF No. 176 at 12, 26.

On November 16, 2018, Cinnaire submitted a proposal to construct a commercial-residential mixed-use building with a charter school on the Property. Cinnaire offered $50,000. Its total project budget proposed was $7,356,050. The parties do not dispute that, from the time that Cinnaire submitted its proposal and continuing until the City rejected it, Cinnaire genuinely desired to acquire the Property to develop the facility it proposed.

Cinnaire's proposal included a contingency that its purchase be supported by "Allocation of Low-Income Tax Credits from WHEDA" for its proposal to close. Cinnaire also identified its lender as Cinnaire Lending and confirmed that its funding was not preapproved. In the proposal form, Cinnaire identified the following possible grant sources: "Affordable Housing Program (AHP), HOME, HTF, WEDC, NMTCs [New Market Tax Credits]." Cinnaire's proposal also identified one property in the City, as well as thirty-six projects in other urban communities, in which it had an ownership interest.

Cinnaire also proposed a partnership with NWSCDC. NWSCDC supported Cinnaire's proposal due to Cinnaire's experience in developing similar properties and its history of obtaining the required financing.

In November 2018, Harling emailed Hamilton, Edwards, Starke, Sharpe, and Little:

[T]here's been some back and for [sic] the conversation with the owners of [Night Owl] wanting to purchase the library. We would very much like to embrace them and bring them on to Villard Avenue. However, I was a little bit confused on what their final intent was in our meeting because there was discussion about their appliance repair business but then the discussion turn [sic] into a phasing [sic] into an event space to host birthdays, repasses and various celebrations.

. . .

I am respectfully asking that we take pause [sic] on entertaining proposals until early 2019 so that we can get all voices at the table and develop Villard Ave. in a thoughtful and intentional way. Other BID districts have been give [sic] that same opportunity . . . we feel strongly that the Old North Milwaukee neighborhood has huge potential and deserves that same thoughtful intent. To do this, the BID will be undergoing a visioning exercise with a professional facilitator to bring ideas, wants and desires from the Villard neighborhood stakeholders to help formulate what Villard should be in years to come.

Later that month, S.M.I.L.E., Inc. ("SMILE"), a non-party, non-stock Wisconsin corporation, submitted a proposal to purchase the Property for $45,500 to expand its current location and provide assorted community supportive services.

On December 5, 2018, Edwards emailed Haessly, informing him that "Hamilton has approved the . . . Snyder/ . . . Laurent proposal." ECF No. 192-1 at 46. About a week later, Edwards emailed Eddie and notified him that his proposal "was not selected to move forward to develop the property." *Id.* at 24. Edwards also stated that the Department of City Development had "received three solid proposals and feels the buyer that was selected," whom Edwards did not at that time disclose, "offers the highest and best use for the" Property. *Id.*

On December 20, 2018, Laurent emailed Edwards to follow up on the Cinnaire Defendants' proposal. *Id.* at 25. Laurent stated that the Cinnaire Defendants were "facing some timing pressures" that he wanted to discuss. *Id.*

On December 23, 2018, Edwards emailed Haessly regarding frustration with some email communications from Eddie.[9] Edwards wrote: "How do you justify leap frogging two other proposals that offered more money, more investment and more jobs. Not to even mention aesthetically, something more attractive to the business corridor." *Id.* at 59.

On January 2, 2019, Laurent emailed Koster (cc'ing Edwards, Dow, and Haessly), noting that Hamilton "is supportive [of] our proposal." *Id.* at 43.

The following month, Endara Enterprises, LLC ("Endara"), a non-party, non-stock Louisiana company, submitted a proposal to purchase the Property for $50,000. Endara proposed to operate a distribution warehouse from the Property.

On March 5, 2019, Edwards emailed Pratt and Sakuri (and cc'd Sharpe) regarding three proposals—that of Plaintiffs, Endara, and the Cinnaire Defendants (in partnership with NWSCDC)—that would be presented at a meeting later that month. ECF No. 192-1 at 28.[10] Edwards

---

[9] Michelle's testimony also acknowledges that Hamilton "claimed that he didn't show support for [Plaintiffs] because he felt threatened by [thei]r emails." ECF No. 178 at 51; *see also* ECF No. 78-2 at 268 ("[Eddie] has been in frequent, repeated contact with members of the real estate staff via email for some time.").

[10] It is not clear from the record what exactly occurred in the interim to resuscitate Plaintiffs' proposal from its December 11, 2018 rejection. One of Eddie's emails provides that "[w]e protested with our alderman" and "[a]fter much effort, he purposed [sic] to let the community way [sic] in on [M]arch 18th 2019." ECF No. 78-2 at 45.

noted that the Cinnaire Defendants' project history "include[d] multiple mixed-use developments in the Midwest," that of Endara "include[d] [a] successful distribution center in Shreveport, LA," but that Plaintiffs' "include[d] currently running the business out of [Plaintiffs'] home." *Id.*

On March 18, 2019, Sharpe, at the request of Hamilton and the City generally, coordinated a community meeting in which interested parties could present their proposals. Laurent attended and made a short presentation. Prior to attending that meeting, the Cinnaire Defendants had no knowledge of the identity of any other party who had submitted a proposal. Plaintiffs also gave a presentation at the meeting, as did Endara.

The day after the meeting, Edwards emailed Turim and Haessly, stating that of all the presenters at the meeting, Eddie "was the least prepared." ECF No. 192-1 at 29.

On March 27, 2018, Eddie emailed Edwards regarding his "concern[] . . . at the level of transparency" in the proposal process. ECF No. 78-2 at 142. Eddie requested "a list of the total of departments and persons, who has [sic] influenced the choices." *Id.* Edwards responded:

> You need to RELAX!
>
> There is no conspiracy here . . . .
>
> Time after time, you have been told if not this property, we are open to helping you find something.
>
> . . .
>
> You really are pushing this to the limit!

*Id.* at 137. Edwards then emailed Turim: "I apologize for the response below to Eddie . . . but this guy is getting to me. He is making a number of false statements . . . ." *Id.*

That same day, Eddie responded to Edward's email:

> No disrespect Dwayne, we are relaxed . . . . We are not in a
> position for other people to tell us whats [sic] best for us.
>
> . . .
>
> Its [sic] clear we cant [sic] trust this process at this point. To
> simply sit back relax. Only those other two purposals [sic]
> have that option.

*Id.* at 141.

The following month, Hanewall told Edwards by email that he had heard that Cinnaire's proposal for the Property was no longer viable because funding was no longer available. Hanewall then wrote:

> If this is true, and with the Endara option being questionable
> at best, and . . . with the HVAC proposal [Plaintiffs' proposal]
> probably not being the highest and best use for the property,
> my sense is that the selection committee should not meet at
> this time. I would propose that the City table this discussion.
>
> I think the City's justification for doing so can be that the
> Villard BID should be allowed to inform what happens to that
> site, but because our planning process has only just begun, we
> are not in a position to responsibly act at this time. The current
> interested parties may not like this, but the City has no
> obligation to make a decision based on the desired timeframe
> of the proposers.

That same day, the City, through Edwards, emailed Dow and Laurent, asking them to address the issue of funding if Cinnaire's proposal was selected. The email was based on the relayed concern that the Cinnaire proposal was "no longer on the table because the funding is not available." Laurent clarified that this assertion was not accurate and that funding was "still available," but that Cinnaire would "need to have solid direction in the next month or so."

Later that month, Hanewall emailed Edwards and other City representatives:

Of the three proposals, the school/housing [the Cinnaire proposal] is the only one that I would consider. The HVAC proposal [Plaintiffs' proposal] is not the highest and best use for that parcel, and there are too many unanswered or misleading items associated with the Endara proposal . . . . Unless the City has reasons that this absolutely must be decided upon now, my preference is to continue to look for a better proposal. Retail on the first floor would be much better for the business district than a school.

A delay would also allow the Villard BID time to complete our visioning and strategic planning which would inform our recommendation . . . . Of course, I fully understand that the City has the final say, but since we now have a viable/active BID, it seems prudent for the City to allow more time for the group to get up to speed and then participate as a stakeholder on this very important site. Furthermore, a delay would allow the BID staff to actively recruit a developer for the site.

On May 5, 2019, Eddie emailed Edwards and Hamilton regarding his frustration about the proposal process. ECF No. 192-1 at 31 ("You told me you wanted us in this property. I don't know what happened to that support."). Eddie also wrote that Plaintiffs and Night Owl "can't compete with those with bucket and buckets of monies." *Id.* The following day, Eddie emailed Haessly, stating: "Please support local entrepreneurs over big money interest!" ECF No. 78-2 at 87.

Later that month, Laurent emailed Edwards inquiring about the status of the City's deliberations. Edwards responded that "staff has decided to reject all proposals and will be putting out a request for proposals." That same day, Edwards notified Endara that "none of the proposals were strong enough (at this time) to develop the site." ECF No. 192-1 at 41. Also that day, Eddie emailed Hamilton, Edwards, Haessly, and

Sharpe, stating: "It was brought to my attention by the aldermans [sic] chief of staff that one of our issues is that those who looks [sic] at are [sic] larger vision and potential, think its [sic] too much for us to handle . . . . I've simplified our business plans [sic] time line [sic] for those concerned." ECF No. 78-2 at 76.

On June 6, 2019, Brown informed Eddie that all proposals, including that of both Plaintiffs and the Cinnaire Defendants, were rejected. ECF No. 192-1 at 21. Later that day, Eddie emailed Brown, Edwards, Adhanti, and Sharpe:

> You clearly don't know what you are talking about. We have been misled and lied to by DCD every [sic] since the [P]roperty was put up for sale. . . . Thats [sic] documented!
>
> I was told by DCD "that they wanted Night Owl Services,llc [sic] in that property"! We were told multiple times that there were three final purposals [sic] still being considered at a BID#19 board meeting. With witnesses.
>
> . . .
>
> I was in the room at cityhall when you had the very public meeting, selling properties to developers like Gorman for pennies on the dollar.
>
> . . .
>
> Your input in this matter is unwelcomed. You do not have the communities [sic] best interest at heart. I can say that without a doubt.
>
> . . .
>
> I've been persistent, but patient. The DCD will not get to make back room desls [sic] or privileged purchases to the big dollar companies or associates.
>
> You are all suppose [sic] to represent me! The BIDs are suppose [sic] to represent us! When this situation is brought to light, [I] will not hold back any details!

ECF No. 78-2 at 49, 59.

On June 12, 2019, Brown emailed Barrett (cc'ing Turim and Edwards) stating that all three proposals—that of Endara, the Cinnaire Defendants, and Plaintiffs—"were rejected" but that the Department of City Development planned to issue a new request for proposals "that would include some information that was not part of the original" request, including details about "environmental hazards in the building that a new owner must be prepared to remediate . . . includ[ing] lead [and] asbestos," as well as information collected through the visioning sessions. ECF No. 192-1 at 11.

To date, the Property remains unsold.

## 4. LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). A fact is "material" if it "might affect the outcome of the suit" under the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court construes all facts and reasonable inferences in the light most favorable to the non-movant. *Bridge v. New Holland Logansport, Inc.*, 815 F.3d 356, 360 (7th Cir. 2016). "At summary judgment a court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party." *Abdullahi*

*v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005) (citing *Anderson*, 477 U.S. at 255).

Ultimately, "the non-movant need not match the movant witness for witness, nor persuade the court that [his] case is convincing, []he need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Waldridge v. Am. Hoeschst Corp.*, 24 F.3d 918, 921 (7th Cir. 1994) (citing *Anderson*, 477 U.S. at 248–49). But simply "denying a fact that has evidentiary support 'does not transform it into a disputed issue of fact sufficient to survive a motion for summary judgment.'" *Uncommon v. Spigen, Inc.*, 305 F. Supp. 3d 825, 838 (N.D. Ill. 2018) (quoting *Roberts v. Advocate Health Care*, 119 F. Supp. 3d 852, 854 (N.D. Ill. 2015)).

## 5.     ANALYSIS

### 5.1     Federal Claims

#### 5.1.1     42 U.S.C. § 1981

"Section 1981 addresses racial discrimination in contractual relationships." *Morris v. Office Max*, 89 F.3d 411, 413 (7th Cir. 1996).  As amended by the Civil Rights Act of 1991, the statute reads in relevant part:

(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . .

(b) For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981. "To establish a claim under § 1981, the plaintiffs must show that (1) they are members of a racial minority; (2) the defendant[s] had an intent to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., the making and enforcing of a contract)." *Morris*, 89 F.3d at 413–14 (citing *Green v. State Bar of Tex.*, 27 F.3d 1083, 1086 (5th Cir. 1994) and *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993)). "The plaintiff has the ultimate burden of proving discriminatory intent on the part of the defendant." *Morris v. Indianapolis Pub. Schs.*, No. 90-2434, 1992 U.S. App. LEXIS 18206, at *7–8 (7th Cir. July 28, 1992).

Plaintiffs' § 1981 claim fails because they cannot "raise a genuine issue of material fact which would preclude the grant of summary judgment" specifically with respect to the second element—that the defendants "had an intent to discriminate on the basis of race." *Morris*, 89 F.3d at 413–14.[11] There is no evidence in the record from which a reasonable juror could conclude that any of the Moving Defendants "had an intent to discriminate on the basis of race," *id.*, and Plaintiffs' own conclusory assertions to the contrary are insufficient to create a genuine dispute of material fact to prevent summary judgment. *Mills v. First Fed. S & L Ass'n*, 83 F.3d 833, 840 (7th Cir. 1996) ("Conclusory allegations by the party opposing the motion cannot defeat the motion.") (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995)).

---

[11]The Moving Defendants do not dispute that Plaintiffs are members of a racial minority and that therefore the first element of Plaintiffs' § 1981 claim is met. *See, e.g.*, ECF No. 157 at 6, ECF No. 163 at 6. And because the Court concludes that Plaintiffs fail to meet the second element of their § 1981 claim—demonstration of an intent to discriminate on the basis of race—the Court need not discuss the third element.

Plaintiffs essentially conceded in their depositions that their claims regarding race discrimination are largely speculative and based on unverified assumptions. When asked whether she "had any evidence . . . regarding any of . . . the decisions made in these backroom deals being made because of your race," Michelle responded, "[n]o." ECF No. 178 at 41. When asked why she believed Little participated in the alleged schemes, Michelle responded: "I just have reason to believe that he spearheaded the steering us away from the property. Why he would do that, I would not know." *Id.* at 53. Similarly, Eddie conceded that he "d[idn't] know" whether Harling "had any racial component" to her attitude regarding Plaintiffs' proposal and that he was "not . . . aware of" any "racial component" on Sharpe's part. ECF No. 176 at 14.

Plaintiffs confirmed that no Moving Defendant ever made any statement to them of a racial nature. They confirmed that the sole basis for their allegations of racial discrimination was the fact that the proposal of Plaintiffs, a Black family with preapproval from their lender, was not selected over that of the Cinnaire Defendants, which did not have preapproved financing and the President of which is not Black. As obvious as this inference apparently is to Plaintiffs, it is unsupported by anything other than Plaintiffs' beliefs, and a party's "own beliefs are not enough to defeat a motion for summary judgment." *Hereford v. Catholic Charities, Inc.*, No. 18-cv-1049-JDP, 2020 U.S. Dist. LEXIS 78711, at *17–18 (W.D. Wis. May 5, 2020).

Any inference of intent to discriminate on the basis of race is flatly contradicted by the record. For example, with respect to Hanewall, an inference that his perspective on Plaintiffs' proposal versus that of the Cinnaire Defendants was at all based on race cannot reasonably be made

because Hanewall did not even support the Cinnaire Defendants' proposal. *See* ECF No. 192-1 at 27 (Hanewall email) ("Retail on the first floor would be much better for the business district than a school."). The record also demonstrates that Plaintiffs themselves believed that other factors—such as competing money interests, the relative size of their business, their relative inexperience, or prior relationships—motivated the failure of their Proposal. *Id.* at 36 (Eddie email) ("Who's in charge of the city of Milwaukee's commercial buildings for sale? Are they looking over local entrepreneurs in favor of big money interest? Is [sic] there conflicts of interests? Are they bias [sic]? Is Milwaukee supportive of local entrepreneurs? Is there some inappropriate contacts and deals made with big money Corporations?"); *id.* at 31 (Eddie emailing that Plaintiffs and Night Owl "can't compete with those with bucket and buckets of monies," such as that Endara and the Cinnaire Defendants could offer); ECF No. 178 at 51 (Michelle testimony) ("I'm not sure why everybody is going back to the racial basis. I just feel like his follow-up would have helped regardless if I was black, white, green, or blue."); ECF No. 78-2 at 87 (Eddie email imploring Haessly to "[p]lease support local entrepreneurs over big money interest").

Plaintiffs' argument that the denigration of their proposal must have been based in race because they had firm financing while the Cinnaire Defendants did not is not only contradicted by the record but is also legally deficient because it "assumes racism with no proof." *Haynes v. Ind. Univ.* 902 F.3d 724, 734–35 (7th Cir. 2018) ("[Plaintiff] . . . urges us to consider certain indicia of his performance . . . To [Plaintiff's] mind these accolades show that [Defendant] *must* have acted out of racial animus because he was otherwise qualified . . . . This argument is twice unsound . . . . [Plaintiff]

must do more than ask us to question the . . . judgment of the [decisionmakers].") (internal citation omitted).

The record reveals no indication whatsoever that any of the Moving Defendants intended to discriminate on the basis of race in dealing with Plaintiffs and their proposal to purchase the Property. The record instead reveals motivations relating to aesthetics of the proposed uses of the Property, the amount of money offered (indeed, Plaintiffs' offer was the lowest of all the proposals and the only one below the listing price), the number of jobs a proposal was anticipated to bring, the perceived feasibility of achieving the goals of the relative proposals, *see* ECF No. 78-2 at 97 (Turim email) ("I have significant concerns about the financial feasibility and stability of [Plaintiffs'] project."), timelines, proposed budgets, and the business and project history of the parties submitting proposals. ECF No. 192-1 at 28 (Edwards email comparing relative project histories and project budgets between Plaintiffs, Endara, and the Cinnaire Defendants), and 59 (Edwards email stating that Endara's and the Cinnaire Defendants' proposals "offered more money, more investment and more jobs," as well as "something more attractive to the business corridor" than Plaintiffs' proposal). But no portion of the record supports the conclusion that Plaintiffs' race played a role in the denigration of their Proposal or that any of the aforementioned motivations were pretextual.

Even § 1981 cases containing evidence of the use of racial slurs have been found to nevertheless fail on summary judgment. *See Mehta v. Des Plaines Dev. Ltd.*, 122 F. App'x 276, 279 (7th Cir. 2005) ("Assuming that such statements [*e.g.*, 'go back to the country where you came from,' 'f_ Indian'] were made (as we must at this stage, . . . ), they are nevertheless insufficient to show discriminatory intent . . . . [in part because] none of them is a direct

admission of discriminatory intent") (internal citation and bracketing omitted) (citing *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 616 (7th Cir. 2000) and *Sanghvi v. St. Catherine's Hosp., Inc.*, 2258 F.3d 570, 574–75 (7th Cir. 2001) (even where party has produced some direct evidence of discrimination, summary judgment against him may nevertheless be appropriate where no reasonable jury could find in his favor)).

That being the case, it is inconceivable to think that the case at bar— which presents no evidence whatsoever, direct or indirect, of racial discrimination—could proceed past this stage. Plaintiffs "cannot proceed to trial on a claim of racial discrimination without any evidence that [the Moving Defendants] discriminated against [the]m because of [their] race." *Haynes,* 902 F.3d at 735.

Plaintiffs also point to a "Policy Statement on Advancing and Achieving Racial Equity and Inclusion" issued by Barrett and assert that by rejecting their proposal, the City of Milwaukee Defendants "didn't qualify with the Cities [sic] own Policies." ECF No. 190 at 10, 19. But this argument does nothing for Plaintiffs. *See Haynes,* 902 F.3d at 735 ("[Plaintiff] was hired through a minority-recruitment initiative, which he says is evidence that [Defendant] needed to address a pervasive bias problem. That can't possibly be right. If anything it shows that [Defendant] sought to recruit and retain minority [participants], not turn them away.").

And because the statute "can be violated only by *purposeful* discrimination," *Gen. Bldg. Contractors Ass'n v. Pa.*, 458 U.S. 375, 391 (1982) (emphasis added), Michelle's characterizations of various Defendants' actions as merely negligent further demonstrate the deficiencies of Plaintiffs' § 1981 claim. *See* ECF No. 178 at 50 (affirming that Barrett was "negligent in failing to" follow-up on Plaintiffs' emails), 51 (affirming that

Hamilton "could have done better" and "done more tending to some of his emails"), and 52 (asserting that Fears "just hav[ing] better communication with [Hamilton]" "could have . . . prevent[ed] [the parties] from being in this situation"). "[T]he mere allegation that a defendant committed a wrong-doing (unrelated to a contractual relation)," even while engaging in blatant race-based conduct such as "making racial slurs" (which, again, did not occur here), "is not sufficient to state a claim for relief under 42 U.S.C. § 1981." *McCormick v. City of Chicago*, 1996 U.S. Dist. LEXIS 9929, at *5 (N.D. Ill. July 12, 1996) (citing *Sampson v. Vill. Discount Outlet, Inc.*, 832 F. Supp. 1163, 1167 (N.D. Ill. 1993)).[12]

For all these reasons, the Court will grant the Moving Defendants' motions for summary judgment on Plaintiffs' § 1981 claim.

### 5.1.2    42 U.S.C. § 1982

"Section 1982 deals with discrimination in property transactions." *Morris*, 89 F.3d at 413. The statute provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. "Because of their common origin and purpose, § 1981 and § 1982 are generally construed in tandem." *Morris*, 89 F.3d at 413 (citing *Tillman v. Wheaton-Haven Rec. Ass'n, Inc.*, 410

---

[12]The City of Milwaukee Defendants assert in their moving brief that "[t]his court has previously, correctly, found that Plaintiffs' [sic] have failed to state a claim against the Defendants . . . ." ECF No. 163 at 3 (citing ECF No. 69). Although immaterial, the Court notes that this assertion is misleading and unhelpful; the claim that the Court considered against the City of Milwaukee Defendants at that time (one under the Fair Housing Act) is no longer before the Court and is distinct from those now at issue.

U.S. 431, 440 (1973) and *Southend Neighborhood Improvement Ass'n v. County of St. Clair*, 743 F.2d 1207, 1210–11 (7th Cir. 1984)).

"To prove a violation of § 1982, a plaintiff must demonstrate 1) interference with property rights, which interference is 2) motivated by racial prejudice." *Lac Du Flambeau Band of Lake Superior Chippewa Indians v. Stop Treaty Abuse-Wisconsin Inc.*, 991 F.2d 1249, 1257 (7th Cir. 1993) (citing *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 616 (1987)).

Plaintiffs' § 1982 claim fails for the same reason their § 1981 claim fails—for lack of evidence of race-based intent. *See* ECF No. 157 at 11 ("[T]he two claims rise and fall together."). The Court will refrain from restating all that it discussed above in Section 5.1.1 and will rely on that same analysis here. Because the record is devoid of evidence indicating that any interference in Plaintiffs' property rights was "motivated by racial prejudice," *Lac Du Flambeau Band of Lake Superior Chippewa Indians*, 991 F.2d at 1257 (assuming there was an actionable interference in the first place), the Court will grant the Moving Defendants' motions for summary judgment as to Plaintiffs' § 1982 claim.

### 5.1.3    Civil Conspiracy under 42 U.S.C. § 1983

"To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (citing *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988)).

Plaintiffs' § 1983 civil conspiracy claim fails on all fronts. First, the Court has already concluded that no actual deprivation of Plaintiffs' constitutional rights has been demonstrated here, so Plaintiffs necessarily cannot meet the second required element—a demonstration that "overt acts

in furtherance [of the alleged conspiracy] actually deprived him of those rights." *Beaman*, 776 F.3d at 510 (citing *Scherer*, 840 F.2d at 442); *Green v. Howser*, 942 F.3d 772, 778 (7th Cir. 2019) ("A § 1983 conspiracy claim requires . . . an underlying constitutional violation . . . .") (citing *Daugherty v. Page*, 906 F.3d 606, 612 (7th Cir. 2018)); *Goldschmidt v. Patchett*, 686 F.2d 582, 585 (7th Cir. 1982) ("Section 1983 does not, however, punish conspiracy; an actual denial of a civil right is necessary before a cause of action arises.") (citing *Adickes v. Kress & Co.*, 398 U.S. 144, 150 (1972) and *Lesser v. Braniff Airways, Inc.*, 518 F.2d 538, 540 (7th Cir. 1975)).

But in any event, Plaintiffs also have not demonstrated that any of the Moving Defendants "reached an agreement to deprive [the]m of [Plaintiffs'] constitutional rights." *Beaman*, 776 F.3d at 510 (citing *Scherer*, 840 F.2d at 442). "Summary judgment should not be granted if there is evidence from which a reasonable jury could infer the existence of a conspiracy." *Id.* at 510–11 (citing *Cooney v. Casady*, 735 F.3d 514, 518 (7th Cir. 2013)). "[P]laintiffs can use circumstantial evidence to establish a conspiracy, but such evidence cannot be speculative." *Id.* at 511 (citing *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003)).

There is no evidence in the record from which a reasonable jury could find that any of the Moving Defendants conspired together to deprive Plaintiffs of their constitutional rights.[13] "Plaintiffs direct the conspiracy count to all named defendants. However, Plaintiffs have failed to present any facts from which to infer that any two or more of the Defendants

---

[13]Having resolved Plaintiffs' civil conspiracy claim on these grounds, the Court need not address some of the Moving Defendants' arguments that the claim fails as to them because they are not suable entities, *see* ECF No. 154 at 12, or because they did not "act[] under the color of state law," *see* ECF No. 157 at 13.

reached an agreement to deprive Plaintiffs of their constitutional rights." *Murray v. Maderak*, No. 99 C 1633, 2000 U.S. Dist. LEXIS 7120, at *33 (N.D. Ill. May 19, 2020). The mere fact that some of the Moving Defendants worked together and exchanged emails evidencing a general preference to sell the Property to an interested party who offered more money, had a higher total project budget, had more development experience, and had already demonstrated its ability to achieve similar development in both Milwaukee and elsewhere, does not mean that those Moving Defendants were conspiring to deprive Plaintiffs of their constitutional rights. Plaintiffs' protestations to the contrary are entirely without foundation, both factual and legal. As the City of Milwaukee Defendants correctly note, Plaintiffs cannot merely "cry 'conspiracy' and throw [themselves] on the jury's mercy." ECF No. 163 at 9 (quoting *Kelley v. Myler*, 149 F.3d 641, 649 (7th Cir. 1998)). Accordingly, the Court will grant the Moving Defendants' motions for summary judgment on this claim.

### 5.2    State Law Defamation Claim

In its liberal review of Plaintiffs' pro se pleadings, the Court concluded that "[a]t least as to Hanewall, Plaintiffs appear to have sufficiently pleaded a claim for defamation under Wisconsin law." ECF No. 111 at 24.[14] Plaintiffs' defamation claim against Hanewall is based on

---

[14]In Eddie's deposition, he appears to assert that both Little and Edwards also "creat[ed] the false narrative, defaming narrative that [Plaintiffs] weren't ready . . . [and] were unprepared to take on the scope of work . . . ." ECF No. 176 at 79; *id.* at 78 ("[Little] defamed us internally in [the Department of City Development] by saying that we weren't prepared."). Because these allegations against Little and Edwards were not apparent from Plaintiffs' operative complaint, the Court will not extend its analysis of a defamation claim to Little and Edwards. *See generally Schmees v. HC1.COM, Inc.*, 77 F.4th 483 (7th Cir. 2023) (district court did not abuse discretion in declining to treat plaintiff's new allegations in

Hanewall allegedly stating that Plaintiffs and Night Owl were "not prepared" to close on the Property, were "not going to be able to do what [Plaintiffs] sa[id] [they were] going to do with the" Property, and were not "capable and prepared to take on a project of this size, this magnitude." ECF No. 176 at 35, 42, 43; ECF No. 111 at 24. When asked where or how Hanewall made these alleged statements, Eddie responded generally, "[w]ell, he texted me a few times about it but also in the emails and the open records . . . ." ECF No. 176 at 43.

Having determined that the Moving Defendants are entitled to summary judgment on all of Plaintiffs' federal claims, the Court is not required to exercise supplemental jurisdiction over Plaintiffs' state law defamation claim. *Dargis v. Sheahan*, 526 F.3d 981, 990 (7th Cir. 2008) (citing 28 U.S.C. § 1367(c)(3)).

> [T]he district courts should exercise this discretion to relinquish jurisdiction over state law claims that remain after the dismissal of federal claims unless any of the following three circumstances exists: (1) the state law claims may not be refiled because a statute of limitations has expired, (2) substantial judicial resources have been expended on the state claims, or (3) it is clearly apparent how the state claims are to be decided.

*Id.* (citing *Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007)). The parties do not brief the issue of supplemental jurisdiction. Nevertheless, because "it is clearly apparent" that Plaintiffs' state law defamation claim is deficient, the Court will exercise its supplemental jurisdiction and address the claim here.

---

summary judgment brief as constructive motion to amend where plaintiff failed to take advantage of earlier opportunity to amend). But even if the Court were to do so, such claims would fail as that against Hanewall does.

A common law defamation claim under Wisconsin law requires: "(1) a false statement; (2) communicated by speech, conduct, or in writing to a person other than the one defamed; and (3) the communication is unprivileged and is defamatory, that is, tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from association or dealing with him or her." *Kuehling v. Trans Union, LLC*, 137 F. App'x 904, 909 (7th Cir. 2005) (quoting *Hart v. Bennet*, 672 N.W.2d 306, 317 (Wis. Ct. App. 2003)).

There are various issues with this claim, all of which mandate that the Court grant summary judgment for Hanewall. First, Plaintiffs themselves are not even certain as to whether and in what form Hanewall actually made a false statement. In his deposition, Eddie testified that he "thought [Hanewall] did [make a false statement about Plaintiffs or about Night Owl]" but that he "can't say for sure." ECF No. 176 at 42. Plaintiffs claim that Hanewall falsely stated that Plaintiffs were unprepared to bring their proposal to fruition, but neither Eddie nor Michelle were able to specify in their depositions in which email(s) or text(s) Hanewall allegedly made this statement. Nor does Plaintiffs' response in opposition to the Moving Defendants' motions clear that issue up. The Court has reviewed the entire submission of emails at ECF No. 192-1 and, as Hanewall correctly notes, "no where [sic] in the . . . emails does [Hanewall] actually state that the Plaintiffs' proposal was the 'least prepared' and instead, [Hanewall] simply stated that the Plaintiffs' proposal was 'not the highest and best use for that parcel.'" ECF No. 182 at 14 (citation omitted).

Second, and focusing on the statement that Hanewall actually made—that Plaintiffs' proposal was not the "highest and best use" for the Property—this statement is not actionable because it is a matter of opinion

rather than one of fact, only the latter of which is "[]capable of being proven false." *Terry v. Uebele*, No. 2009AP2381, 2011 Wisc. App. LEXIS 34, at *10 (Wis. Ct. App. Jan. 19, 2011). "An expression of opinion generally cannot be the basis of a defamation action." WIS JI—CIVIL 2500. What constitutes the "highest and best use" of a piece of property is inherently subjective and, in this context, relative to the other proposal submissions. "Highest and best use" are "[i]ndefinite, ambiguous, and vague designations that c[an] not be assigned a precise meaning," and they therefore "cannot support an action for defamation." *See Blomdahl v. Peters*, No. 2014AP2696, 2016 Wisc. App. LEXIS 67, at *6 (Wis. Ct. App. Feb. 4, 2016) (citing *Bauer v. Murphy*, 530 N.W.2d 1, 6 n.13 (Wis. Ct. App. 1995)). Michelle conceded as much in her deposition. ECF No. 178 at 40 (Q: "And that was [Hanewall's] opinion based on his review of . . . your proposal?" A: "His opinion.").

Characterizing Plaintiffs' proposal as not the "highest and best use" of the Property is also not defamatory because it has no inherent negative connotation such that its expression could harm Plaintiffs' reputation. It cannot reasonably be interpreted as a comment on the merits or value of Plaintiffs' proposal, but rather refers to a perceived lack of compatibility with or suitability for the Property and the needs and wants of the neighboring community.

For these reasons, the Court will grant summary judgment to Hanewall on Plaintiffs' state law defamation claim.

6.    **CONCLUSION**

For the reasons stated herein, the Court will grant summary judgment for the Moving Defendants, will dismiss Brown as a defendant from the action, and will dismiss the case with prejudice.

Accordingly,

IT IS ORDERED that Defendant Martha Brown be and the same is hereby **DISMISSED** as a defendant from this action;

IT IS FURTHER ORDERED that Defendants Stephanie Harling, Havenwoods HEDC/BID #31, and Angelique L. Sharpe's motion for summary judgment, ECF No. 153, be and the same is hereby **GRANTED**;

IT IS FURTHER ORDERED that Defendants Northwest Side Community Development Corporation, Willie Smith, and Howard Snyder's motion for summary judgment, ECF No. 156, be and the same is hereby **GRANTED**;

IT IS FURTHER ORDERED that Defendants Tom Barrett, Dwayne K. Edwards, Sakuri Fears, Matt Haessly, Ashanti Hamilton, Vanessa Koster, Ken Little, Andrea Pratt, James Starke, and Amy E. Turim's motion for summary judgment, ECF No. 162, be and the same is hereby **GRANTED**;

IT IS FURTHER ORDERED that Defendants Cinnaire Solutions, James Dow, and Christopher Laurent's motion for summary judgment, ECF No. 175, be and the same is hereby **GRANTED;**

IT IS FURTHER ORDERED that Defendant Jeff Hanewall's motion for summary judgment, ECF No. 181, be and the same is hereby **GRANTED**;

IT IS FURTHER ORDERED that Plaintiffs' claims against the Moving Defendants under 42 U.S.C. § 1981, under 42 U.S.C. § 1982, and for civil conspiracy under 42 U.S.C. § 1983 be and the same are hereby **DISMISSED with prejudice**;

IT IS FURTHER ORDERED that Plaintiffs' state law defamation claim against Defendant Hanewall be and the same is hereby **DISMISSED with prejudice**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 23rd day of October, 2023.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge

---

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.